**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AL-AMIN ABDUL-JABBAR,** | : | **CIVIL ACTION** |
| **SHATISHA ABDUL-JABBAR,** | : | |
| **LATYSA BELL, and** | : | |
| **SHARON BELL,** | : | **No.  2:21-cv-2077** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **OFFICER MATTHEW SIBONA,** | : | **AMENDED COMPLAINT** |
| **OFFICER NATHAN LONDON,** | : | |
| **OFFICER LEVAUN RUDISILL** | : | |
| **OFFICER DIETRA CUFFIE,** | : | **JURY TRIAL DEMANDED** |
| **OFFICER [FNU] SIMMONS,** | : | |
| **OFFICER [FNU] FLOYD,** | : | |
| **OFFICER [FNU] FRANCIS,** | : | |
| **OFFICERS JOHN AND JANE DOES 1-10** | : | |
| **In their individual and official capacities,** | : | |
| **ASSISTANT DISTRICT ATTORNEYS** | : | |
| **JOHN AND JANE DOES 1-10,** | : | |
| **In their individual and official capacities,** | : | |
| | : | |
| **Defendants.** | : | |

## INTRODUCTION

1.     This action for declaratory, injunctive and other appropriate relief is brought by Plaintiffs

       Al-Amin Abdul-Jabbar, Shatisha Abdul-Jabbar, Latysa Bell, and Sharon Bell (collectively

       "Plaintiffs") to redress the intentional violations by and other of the rights secured to them

       under the laws of the United States of America.

## JURISDICTION

2.     Jurisdiction is conferred upon this court by the Fourth, Fifth and Fourteenth Amendments

       of the Constitution of the United States and 42 U.S.C. § 1983 which provide original

       jurisdiction for Plaintiffs' claims.

3.    Jurisdiction over the state law claims is based on the principles of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

4.    The amount in controversy exceeds one hundred and fifty thousand dollars ($150,000).

## VENUE

5.    All actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania and involve Defendants who reside within the jurisdictional limits.   Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and (c).

## PARTIES

6.    Al-Amin Abdul-Jabbar resides in the City limits of the City of Philadelphia, PA ("Mr. Jabbar").

7.    Shatisha Abdul-Jabbar resides in the City limits of the City of Philadelphia, PA ("Mrs. Jabbar").

8.    Mr. and Mrs. Jabbar are husband and wife.

9.    Latysa Bell resides in the City limits of the City of Philadelphia, PA.

10.    Sharon Bell resides in the City limits of the City of Philadelphia, PA.

11.    The City of Philadelphia is a municipality in the Commonwealth of Pennsylvania, maintaining municipal offices at 1515 Arch Street, Philadelphia, PA 19102.

12.    The City of Philadelphia controls and operates the Philadelphia Police Department ("PPD").

13.    The Defendant Officers, including Matthew Sibona, Nathan London, Levaun Rudisill, Dietra Cuffie, [FNU] Simmons, [FNU] Floyd, [FNU] Francis, and the John and Jane Doe

Officers, were at all times material PPD officers acting under color of law (collectively "Defendant Officers").

14. The Office of the District Attorney of Philadelphia County is the largest prosecutor's office in the state of Pennsylvania maintaining its offices at 3 Penn Square, Philadelphia, PA 19107.

15. The Defendant District Attorneys, including the John and Jane Doe Assistant District Attorneys, were at all times material acting under color of law (the "Defendant ADAs")

## FACTS

## OCTOBER 2019 ARREST OF AL-AMIN ABDUL-JABBAR

16. On October 24, 2019, the Defendant Officers pulled Mr. Jabbar over while he was driving his vehicle to work at or around 2616 North 12th Street, Philadelphia, PA without probable cause.

17. Mr. Jabbar voluntarily pulled his vehicle to the side of the street and was immediately surrounded by at least six police vehicles operated by the Defendant Officers.

18. With their firearms drawn, the Defendant Officers demanded that Mr. Jabbar exit his vehicle but did not explain the reason for their demand or why they pulled his vehicle over.

19. Mr. Jabbar demanded that Defendant Officers produce an arrest warrant which they refused to do.

20. Mr. Jabbar eventually agreed to exit his vehicle to have a conversation with the Defendant Officers and was immediately placed in handcuffs and seated in the back of a police vehicle; however, Mr. Jabbar was not read his *Miranda* rights, shown an arrest warrant, or provided any reasons for his arrest.

21. While Mr. Jabbar was detained in the back of a police vehicle, the Defendant Officers performed an unlawful search of his automobile at which time Defendant Officer Floyd allegedly produced a "safe" from the vehicle which allegedly contained illegal narcotics.

22. However, the safe that Defendant Officer Floyd allegedly produced from Mr. Jabbar's vehicle was not present when Mr. Jabbar voluntarily exited his vehicle; it was planted by the Defendant Officers.

23. Mr. Jabbar's vehicle was left at the scene until it was later recovered by a family member.

**<u>UNLAWFUL SEARCH OF 2616 N. 12th STREET</u>**

24. Thereafter, the Defendant Officers drove Mr. Jabbar to the home where his mother and sister, Sharon Bell and Latysa Bell, resided located at 2616 N. 12th Street, Philadelphia, PA (the "Property").

25. When the Defendant Officers arrived at the Property, at or around 9:00 a.m., they executed a search warrant by battering down the front door of the residence without first notifying those in the Property of their presence or the purpose thereof.

26. A simple search on Philadelphia's property ownership website would have revealed that the Property was owned by Latysa Bell and her husband, Robert B. Walker, not Mr. Jabbar.

27. Luckily, Mr. Walker had left the Property to take his and Ms. Bell's young children to school.

28. Upon their unlawful entry in the Property, the Defendant Officers, with their weapons drawn, found Latysa Bell in the nude dressing for work which caused her profound shock, fright, embarrassment, and humiliation.

29. Latysa Bell continues to suffer from severe emotional distress as a result of these events.

30.     Subsequently, a female Defendant Officer entered Sharon Bell's room with a firearm aimed directly at her head causing her to urinate herself out of sheer shock, fear, and confusion.

31.     At the time of the Defendant Officers' unlawful entry into the Property, and still to this day, Sharon Bell was suffering from early onset dementia among many other serious medical conditions which only heightened her shock, fear, and confusion.

32.     The Defendant Officer allowed Sharon Bell to shower as the Defendant Officers continued their unlawful search of the Property but watched her as she showered which caused her undue embarrassment and humiliation.

33.     Sharon Bell continues to suffer from severe emotional distress today as a result of these events.

34.     As the Defendant Officers were scouring the Property, a Defendant Officer attempted to plant the safe that Defendant Officer Floyd allegedly recovered from Mr. Jabbar's vehicle in the Property.

35.     However, the Defendant Officers' attempt to plant narcotics in the Property was foiled after Latysa Bell witnessed them and exclaimed "that box did not come from this house!"

36.     Nothing was recovered from the Property.

37.     The front door that the Defendant Officers unlawfully battered down still remains in disrepair and neither Latysa Bell nor Mr. Walker have received any compensation from the City of Philadelphia to repair their door.

38.     Further, during the Defendant Officers' unlawful search of the Property, they caused physical damage to the Property and to the personal possessions of Latysa Bell and Sharon Bell which the City of Philadelphia has not compensated them for.

## UNLAWFUL PROSECUTION OF AL-AMIN ABDUL JABBAR

39.     Following the Defendant Officers' unlawful search of the Property, they transported Mr.
        Jabbar to a warehouse on Fox Street, near Allegheny Avenue, where several other
        individuals were detained, i.e. a roundup.

40.     There, the Defendant Officers questioned Mr. Jabbar for over three (3) hours about
        individuals and events in his neighborhood, and provided that if he provided them
        information that he would be free to leave; however, Mr. Jabbar explained that he did not
        possess any information responsive to their inquiries.

41.     Since Mr. Jabbar did not comply with the Defendant Officers' demands, Mr. Jabbar was
        transported to Curran-Fromhold Correctional Facility ("CFM") on charges of possession
        of a controlled substance with the intent to deliver, conspiracy, criminal use of a
        communication facility, and possession of a prescription medication without a prescription
        despite the fact that the Defendant Officers did not recover any illegal narcotics from Mr.
        Jabbar.

## PROCEDURAL HISTORY OF THE
## CRIMINAL CHARGES AGAINST AL-AMIN ABDUL JABBAR

42.     Nearly one and a half month later, on December 6, 2019, Mr. Jabbar appeared at his
        preliminary hearing where the Defendant ADAs dismissed the charges against Mr. Jabbar
        but represented to the judge that new charges would be filed after they investigated Mr.
        Jabbar's arrest and evaluated the evidence.

43.     However, upon information and belief, at this time the Defendant ADAs were aware that
        the Defendant Officers did not recover illegal narcotics from Mr. Jabbar's vehicle and
        knew that they would be unable to sustain their burden of proof at trial but did not disclose
        this information to Mr. Jabbar's criminal defense attorney or the court.

44. As a result of the representations made by the Defendant ADAs, the judge placed Mr. Jabbar on house arrest while the Defendant ADAs mulled Mr. Jabbar's new charges and performed their investigation rather than dismiss the charges with prejudice knowing that they lacked probable cause and that it would be impossible for them to sustain their burden of proof since no narcotics were recovered on Mr. Jabbar at the time of his October 24, 2019 unlawful arrest.

45. Thereafter, on January 22, 2020, the Defendant ADAs re-filed the **exact same charges** against Mr. Jabbar in connection with his October 24, 2019 arrest despite knowing that they lacked probable cause and that it would be impossible for them to sustain their burden of proof since no narcotics were recovered on Mr. Jabbar at the time of his October 24, 2019 unlawful arrest.

46. On February 20, 2020, the Defendant ADAs voluntarily dismissed the charges against Mr. Jabbar since they would have been unable to sustain their burden of proof since no narcotics were recovered from Mr. Jabbar at the time of his October 24, 2019 unlawful arrest.

47. As a result of the Defendants' unlawful conduct, Mr. Jabbar was forced to remain incarcerated and/or on house arrest for one hundred twenty (120) days.

## POLICIES, CUSTOMS, AND PRACTICES OF THE CITY OF PHILADELPHIA

48. Plaintiffs were damaged and injured as set forth above under 42 U.S.C. § 1983 by the City of Philadelphia.

49. Prior to Mr. Jabbar's unlawful October 24, 2019 arrest, the City of Philadelphia—through its policymakers—developed and maintained policies and/or customs which fostered deliberate indifference to the constitutional rights of persons in the City of Philadelphia.

50. It is the policy and/or custom of the City of Philadelphia to cover-up and avoid detection

of improper and illegal police activity, particularly by narcotics officers, including but not limited to planting evidence, lying under oath, false arrest, false imprisonment, unlawful detention, assault and battery, and infliction of emotional distress.

51.  It is the policy and/or custom of the City of Philadelphia to fail to sufficiently supervise against, train and/or re-train against, and discipline illegal police activity, particularly by narcotics officers, including but not limited to planting evidence, lying under oath, false arrest, false imprisonment, unlawful detention, assault and battery, and infliction of emotional distress.

52.  In fact, there has been a longstanding history of PPD Officers engaging in rampant illegal conduct, particularly involving narcotics arrests.   A non-exhaustive list of such conduct includes:

(a)    In or around February 1995, Philadelphia Police Officer John Baird and 5 other members of the 39th District were Federally prosecuted and ultimately sentenced for violating the rights of, and stealing money from, over 40 Philadelphians.  These officers planted drugs on innocent individuals, conducted unreported raids, and stole from suspects.

(b)    In 2010, Barbara Laker and Wendy Ruderman authored a 10-month investigative series in the Philadelphia Daily News titled "Tainted Justice" which exposed several PPD officers who were members of the now defunct "anti-narcotics taskforce."  The evidence uncovered demonstrated that these officers committed sexual assaults, disabled surveillance cameras during drug raids to hide their misdeeds, filed fraudulent arrest warrants, and stole merchandise and money from small retailers, i.e. bodegas.  Hundreds of drug related cases that these officers were

involved with had to be re-examined and many were thrown out which has cost the City millions of dollars.  These officers were not terminated, but were removed from working narcotics and placed on desk duty.  These officers were supervised by Captain Joseph Bologna.

(c) An FBI investigation revealed that one of the subject officers in the "Tainted Justice" investigation, Jeffrey Cujdik, fabricated evidence on at least two dozen occasions using a confidential informant with whom he had a business relationship, and several other informants, to secure arrest warrants for drug related offenses. Cujdik was terminated in May 2014 as a result but was reinstated to the PPD in November 2014.

(d) Another officer, Thomas Tolstoy, was accused of sexually assaulting at least 3 women while taking part in bodega raids among other bad acts as a member of the "anti-narcotics taskforce."  The City paid two of his sexual assault victims a total of $227,500.  A PPD internal affairs investigation sustained 8 findings of misconduct against Tolstoy.  However, Tolstoy was not terminated and only received a thirty (30) day suspension.  In 2019, Tolstoy received a promotion with a 14% salary increase.

(e) During one bodega raid subject of the "Tainted Justice" investigation, Bologna was caught on surveillance cameras instructing his subordinates to disable a security camera which resulted in him being suspended for failure to supervise.  In the wake of this scandal, Bologna was not terminated, but was transferred to the 19th District in a supervisory capacity.  In the 19th District, Bologna, as Captain, ordered his new command to ramp up car and pedestrian stops over minor infractions in the hunt for

more serious crimes. Bologna's units became informally known as the "Five Squad" and received the third most complaints from 2013 to 2016 out of all districts. Most of the complaints involved the same allegations: thinly premised car, pedestrian, and house searches that escalated into beatings, vandalism, threats, or thefts. Several other complaints contained another specific pattern of conduct: officers breaking into locked glove boxes during car stops. In 2017, Bologna received a "merit promotion" to staff inspector. In 2020, Bologna drew National criticism for assaulting multiple protestors during the Black Lives Matter protests which resulted in several civil lawsuits being filed against him and the City. Bologna was also charged with felony assault for one incident. Bologna is on the PPD's *Brady* list.

(f)     In 2014, 6 PPD Narcotics Field Unit officers were arrested as part of a Federal corruption probe: John Speiser, Thomas Liciardello, Michael Spicer, Brian Reynolds, Perry Betts, and Linwood Norman. These officers were accused of stealing over a half a million dollars' worth of property, drugs, and cash from suspects from February 2006 to November 2012. Liciardello was also charged with falsifying records. At trial, a former PPD narcotics officer, Jeffrey Welker, testified against these officers and provided that he and other members of his undercover unit routinely lied to judges and juries after planting evidence, stealing drug money, and beating suspects to obtain information which resulted in an unjust level of convictions. These officers were ultimately acquitted by a Federal jury and were reinstated to the PPD in July 2015. Over 800 convictions that involved their testimony were reversed as a result.

(g)     In 2016, a PPD sergeant and member of the Department's Narcotics Field Unit, Michael Kennedy, stole money while executing a search warrant in the City's Kensington section.  However, the target had previously installed security cameras and recoded the theft.  The video was later posted to social media.  When Kennedy was questioned by the FBI in 2017, he lied and said he logged the money he removed from the property into evidence.  Kennedy currently faces federal criminal charges including conspiracy, obstruction of justice, and making false statements to the FBI.  Kennedy is on the DA's do not call list.

(h)     On June 8, 2017, PPD Officer Ryan Pownall, while he was transporting children to the Special Victims Unit, confronted a black male, David Jones, who was illegally riding a dirt bike in traffic and had pulled into a parking lot of a night club.  Pownall stopped and frisked Jones and felt a handgun in his waist band.  A scuffle ensued.  According to eyewitnesses, Pownall took out his service weapon and held it to the back of Jones' head.  Powell attempted to discharge his firearm, but it jammed.  Jones then broke free and began to run which prompted Pownall to fire three rounds at Jones as he fled.  Two of those rounds stuck Jones and killed him.  Pownall told another officer at the scene of the shooting that Jones tossed his firearm away as he ran, but the surveillance footage from the night club demonstrated that Jones had nothing in his hands as he fled and that he was also approximately 35-feet away from Pownall when he was shot.  Pownall was suspended as a result of the incident, and later terminated in September 2017 and charged with criminal homicide.  Pownall's local FOP held a fundraiser for him dubbed "I Stand With Ryan."

(i)    Pownall was involved in a similar shooting in 2010 involving a black man, Carnell Williams-Carney, who he shot as he fled from an arrest.  In this incident, Pownall and his partner fired 10 founds at Williams-Carney before one of Pownall's rounds struck him in the back, paralyzing him from the chest down.  Pownall did not receive any discipline in connection with this incident.

(j)    From 2013 to 2017, PPD Officer Reuban Ondarza was the target of 7 IA investigations.  In 2015, Ondarza, and six other officers, were found to have falsified information and ignored departmental guidelines during vehicle stops that ended with warrantless searches involving officers prying open motorists' locked glove compartments.  In 2017, Ondarza was named in a civil rights lawsuit by a driver alleging that she suffered an ankle fracture when she was removed from her vehicle and beaten.  The lawsuit was settled and a week later, Ondarza changed his Facebook account profile picture to a photograph of a beaten and bloodied African American man.  In 2019, Ondarza became the subject of the Plain View Project for his social media posts of images mocking beaten and bloodied criminal suspects, mostly African American, and became the target of an IA investigation as a result, but was not terminated.

(k)    In March 2018, Philadelphia District Attorney Larry Krasner released a list of 29 PPD officers whom prosecutors have sought to keep from testifying over allegations of misconduct including but not limited to lying under oath to secure an arrest, mishandling evidence in narcotics investigations, generating false reports, bribery, and corruption.  The DA's Office also maintains a Police Misconduct Database which DA Krasner's administration expanded to included nearly 750 PPD

officers.  The database includes PPD officers with histories of arrests, convictions, planting evidence, coercing confessions through abuse, fabricating confessions, lying in court, disciplinary violations, and/or documented behaviors that warrant disclosure to criminal defendants.  Before he left office, the former District Attorney, Seth Williams, created a list of 66 current or former PPD officers who he identified as facing allegations of misconduct on and off the job which included many of the same officers in DA Krasner's list.

(l)   In August 2018, Ryan Briggs, a WHYY investigative journalist, published his findings in connection with the PPD's release of Internal Affairs records involving civilian complaints from 2013 to 2018.  Briggs' findings demonstrated that on average, at least 56 PPD officers received at least one misconduct complaint per year with the worst accruing more than 3 complaints per year.  Further, at least 30 PPD officers received 10 or more complaints from 2013 to 2018 and 14 officers received 10 or more complaints from 2015 to 2018.  In the same publication, Briggs explored the following PPD officers and incidents:

(i)   In Northwest Philadelphia's 14th District, Officers Charles Kink, Jr., David Dohan, Lucas Lesko, and Brad Momme, who served under Captain John Hearn, were charged with conducting high-volume car and pedestrian stops. Together, during a five-year span, these officers received 49 civilian complaints that included 90 separate offenses.  Momme and David O'Connor were the subjects of another complaint in which they were accused of choking a suspect they accused of swallowing drugs.  Both Momme and O'Connor have been the subject of questioning over their

credibility as witnesses due to a pattern of unlawful stops and searches. Momme and O'Connor were also sued by a former PPD officer who claimed that the two racially profiled and roughed him up in 2013 and a *pro se* plaintiff who successfully claimed that he was wrongfully arrested by these two.  Further, the City was forced to pay a disabled man $25,000 after Momme and O'Connor dragged him out of his car during a stop and kicked him in the legs.

(ii)     In North Philadelphia's 35th District, Officers Eric Ruch, Jr. and David Tamamato accrued 4 complaints together, which included 14 separate offenses, related to unjustified car searches and using excessive force during arrests.  5 out of the 14 charges were sustained.  Rusch was dismissed from the PPD in 2018 after he shot and killed an unarmed African American man following a car chase in 2017.  The City paid $1.2 million to the victim's family in a settlement.  In October 2020, Ruch was charged with first degree murder in connection with the shooting which was later reduced to third-degree murder and voluntary manslaughter charges.  The case is still active.

(iii)    In Center City's 6th District, Officer Joe Ferrero, Jr. was the subject of at least 12 complaints totaling 17 separate misconduct allegations.  Ferrero's records demonstrated a high volume of harassment allegations.

(iv)    In Southwest Philadelphia's 12th District, Officer Marc Marchetti had received at least 16 civilian complaints including 21 alleged offenses which ranged from rude remarks to violent arrests.  Marchetti's 16 complaints ranked second among all PPD officers in that span of time. On or about the

time when Larry Krasner was elected to Philadelphia District Attorney in 2017, Officer Marchetti took to Facebook to write that "[Krasner] doesn't give me my arrest powers so [I] don't care.  No blood on my hands when he lets the sh*tbags out."  He also created the hashtag #notmyDA and changed his Facebook profile photo to a photograph of DA Krasner.  On another occasion in 2017, Officer Marchetti was the subject of a video posted on Facebook by his fellow PPD officer, Kevin Klein, of him making a prank phone call to the law office of Krasno & Onwudinjo, which DA Krasner had no affiliation with, which was made inside a PPD facility. Upon information and belief, Marchetti was not disciplined for these incidents involving DA Krasner.

(v)     In Bologna's 19th District, Officer Kevin Lewis was the subject of 11 complaints that included 23 alleged offenses in just over two years.  The majority of the complaints against Lewis involved physical abuse.  Lewis was also the subject of the Plain View Project for making offensive social media posts mocking immigrants and ridiculing a beaten criminal suspect. As a result of the social media posts, Lewis was placed on desk duty.

(m)     In January 2018, the PPD conducted an IA investigation into the Narcotic Bureau's scheme to flip low-level suspects into off-the-books confidential informants through a process that would evolve into falsifying paperwork, as well as hiding information from the DA's office.  Inspector Raymond Evers and Chief Inspector Anthony Boyle were found to have been the driving forces behind this policy which was presented to the Narcotics Bureau's officers in a May 2017 mandatory meeting

in Germantown.  Both Evers and Boyle were the targets of several IA investigations in connection with this policy.  Three IA charges were sustained against Evers for abuse of authority, failure to supervise, and lying in an IA investigation.  One IA charge was sustained against Boyle for failure to supervise.  Two other narcotics officers had IA charges sustained for submitting false paperwork.

(n)     In June 2019, the Plain View Project published a publicly accessible database of racists and violent Facebook posts made by over 330 PPD officers.  Out of those 330 officers, only 15 officers were terminated or resigned, 9 officers received month long suspensions, and 114 officers received "command level" discipline which carried a maximum of 5 days suspension.  72 officers were placed on desk duty pending an investigation into their social media footprints.  153 of the officers whose Facebook posts were available on the Plain View Project's database had accrued at least one civilian complaint since 2015.  In total, 338 civilian complaints had been filed against the group of 153 officers since 2015.

(o)     In December 2020, 3 PPD officers were placed on desk duty pending an IA investigation into the arrest of Termaine Joseph Hicks who was cleared of a 2001 rape after spending 19 years in prison.  The Innocence Project and the District Attorney's Conviction Integrity Unit raised serious questions about whether the officers had fabricated evidence, planted a gun, and arrested Hicks under false pretenses to conceal a police shooting of an innocent bystander.  Interestingly, under DA Krasner, over 25 rape or murder convictions of mostly African American men have been vacated as a result of discovered prosecutorial and police misconduct.

(p)     Since 2018, the DA's Office Special Investigation Unit has opened more than 50 criminal cases against PPD and other law enforcement officers in the City.  In 2021, more than 10 current or former PPD officers have been arrested and criminally charged.

53.     It is the policy and/or custom of the City of Philadelphia to inadequately supervise and train its Police Officers, including the Defendant Officers, against a code of silence or "blue code" of Officers refusing to intervene against or provide truthful information against constitutional violations and other unlawful misconduct committed by their fellow Officers.

54.     The aforementioned policies and customs were ratified by leadership and policymakers in the PPD, specifically the PPD Commissioner, Deputy Commissioners, Chief Inspectors, and Inspectors, who were aware of the aforementioned pattern and practice of constitutional violations set forth above.

55.     As a result of the above-described policies and customs and/or the lack thereof, Police Officers of the City of Philadelphia, including the Defendant Officers, believed that their actions would not be properly monitored by supervisory Officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

**COUNT I**
**AL-AMIN ABDUL JABBAR V. ALL DEFENDANTS**
**MALICIOUS PROSECUTION under 42 U.S.C. § 1983**

56.     Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

57.     Defendants instituted criminal proceedings against Mr. Jabbar without probable cause and with malice, in violation of Mr. Jabbar's constitutional rights.

58. Defendants maintained these criminal proceedings against Mr. Jabbar knowing that they could not sustain their burden of proof.

59. Defendants knew that the criminal charges against Mr. Jabbar were unwarranted.

60. The criminal proceedings were terminated in favor of Mr. Jabbar.

61. As a direct and proximate result of the actions of Defendants, Mr. Jabbar was incarcerated, expended monies including attorneys' fees in defense of the criminal charges against him and was terminated from his employment.

62. Mr. Jabbar was also deprived of his liberty.

63. The above actions of Defendant Officers were a result of the policies, practices and/or customs of the City of Philadelphia.

64. The aforesaid actions of Defendants constitute malicious prosecution, in violation of Mr. Jabbar's Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Mr. Jabbar respectfully requests this Honorable Court:

    a. Enter a declaratory judgment that Defendants' acts complained of herein have violated and continue to violate his rights;

    b. Award him compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

    c. Award him reasonable costs and attorneys' fees;

    d. Award him punitive damages; and

    e. Grant him any other relief this Court deems just and proper under the circumstances.

## COUNT II
## AL-AMIN ABDUL-JABBAR V. ALL DEFENDANTS
## MALICIOUS USE AND ABUSE OF PROCESS under 42 U.S.C. § 1983

65.     Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

66.     Defendants instituted and maintained criminal proceedings against Mr. Jabbar without probable cause for an ulterior purpose or motive.

67.     Furthermore, before Plaintiff was even arrested or criminally charged, Defendants knew that they lacked the necessary evidence to prove their case against Mr. Jabbar.

68.     Defendants maliciously and deliberately misused the criminal process against Mr. Jabbar.

69.     As a direct and proximate result of the actions of Defendants, Mr. Jabbar was incarcerated, expended monies including attorneys' fees in defense of the criminal charges against him and was terminated from his employment.

70.     Mr. Jabbar was also deprived of his liberty.

71.     The above actions of the Defendant Officers were a result of the policies, practices and/or customs of the City of Philadelphia.

72.     The aforesaid actions of Defendants constitute malicious use and abuse of process, in violation of Mr. Jabbar's Fourth, Fifth and Fourteenth Amendment rights.

        WHEREFORE, Mr. Jabbar respectfully requests this Honorable Court:

        a.      Enter a declaratory judgment that Defendants' acts complained of herein have violated and continue to violate his rights;

        b.      Award him compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay,

loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.     Award him reasonable costs and attorneys' fees;

d.     Award him punitive damages; and

e.     Grant him any other relief this Court deems just and proper under the circumstances.

## COUNT III
## AL-AMIN ABDUL-JABBAR V. THE CITY OF PHILADELPHIA AND THE DEFENDANT POLICE OFFICERS
## FALSE ARREST under 42 U.S.C. § 1983

73.    Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

74.    Mr. Jabbar was arrested by the Defendant Officers without probable cause.

75.    As a direct and proximate result of the actions of the Defendant Officers, Mr. Jabbar was incarcerated, expended monies including attorneys' fees in defense of the criminal charges against him and was terminated from his employment.

76.    Mr. Jabbar was also deprived of his liberty.

77.    The above actions of the Defendant Officers were as a result of the policies, practices and/or customs of the City of Philadelphia.

78.    The aforesaid actions of the Defendant Officers constitute a false arrest, in violation of Mr. Jabbar's Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Mr. Jabbar respectfully requests this Honorable Court:

a.     Enter a declaratory judgment that Defendants' acts complained of herein have violated and continue to violate his rights;

b.      Award him compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.      Award him reasonable costs and attorneys' fees;

d.      Award him punitive damages; and

e.      Grant him any other relief this Court deems just and proper under the circumstances.

**COUNT IV**
**AL-AMIN ABDUL-JABBAR V. ALL DEFENDANTS**
**FALSE IMPRISONMENT under 42 U.S.C. § 1983**

79.   Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

80.   Defendants acted willfully to confine Mr. Jabbar without his consent and without probable cause.

81.   Plaintiff was aware of his confinement.

82.   As a direct and proximate result of the actions of Defendants, Mr. Jabbar was incarcerated, expended monies including attorneys' fees in defense of the criminal charges against him and was terminated from his employment.

83.   Mr. Jabbar was also deprived of his liberty.

84.   The above actions of the Defendant Officers were as a result of the policies, practices and/or customs of the City of Philadelphia.

85.   The aforesaid actions of Defendants constitute false imprisonment, in violation of Mr. Jabbar's Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Mr. Jabbar respectfully requests this Honorable Court:

    a.    Enter a declaratory judgment that Defendants' acts complained of herein have violated and continue to violate his rights;

    b.    Award him compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

    c.    Award him reasonable costs and attorneys' fees;

    d.    Award him punitive damages; and

    e.    Grant him any other relief this Court deems just and proper under the

## COUNT V
### SHARON BELL AND LATYSA BELL V. THE CITY OF PHILADELPHIA AND THE DEFENDANT OFFICERS
### <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

86.    Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

87.    The acts of the Defendant Officers towards Sharon Bell and Latysa Bell were extreme and outrageous.

88.    The Defendant Officers acted with an intentional and/or a reckless disregard towards Sharon Bell and Latysa Bell.

89.    As a result of the Defendant Officers' actions, Sharon Bell and Latysa Bell suffered and continue to suffer from severe emotional distress.

WHEREFORE, Sharon Bell and Latysa Bell respectfully request this Honorable Court:

    a.      Award them compensatory damages including but not limited to: pain, suffering, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

    b.      Award them reasonable costs and attorneys' fees;

    c.      Award them punitive damages; and

    d.      Grant them any other relief this Court deems just and proper under the circumstances.

**COUNT VI**
**SHARON BELL AND LATYSA BELL V. THE CITY OF PHILADELPHIA AND THE DEFENDANT OFFICERS**
**COMMON LAW TRESPASS**

90.    Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

91.    The Defendant Officers unlawfully and intentionally entered the Property by use force.

92.    Neither Sharon Bell nor Latysa Bell invited the Defendant Officers into the Property or consented to their entry into the Property.

93.    As a result of the Defendant Officers' unlawful and intentional entry into the Property, the Property sustained physical damage as did the personal possessions of Sharon Bell and Latysa Bell.

WHEREFORE, Sharon Bell and Latysa Bell respectfully request this Honorable Court:

    a.      Award them compensatory damages;

    b.      Award them reasonable costs and attorneys' fees;

    c.      Award them punitive damages; and

    d.      Grant them any other relief this Court deems just and proper under the circumstances.

## COUNT VII
## SHATISHA ABDUL-JABBAR V. ALL DEFENDANTS
## LOSS OF CONSORTIUM

94.    Plaintiffs incorporate by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

95.    As a result of Defendants' collective illegal acts against Mr. Jabbar, Mrs. Jabbar was deprived of the services and companionship of her husband.

WHEREFORE, Mrs. Jabbar respectfully requests this Honorable Court:

      a.      Award her compensatory damages;

      b.      Award her reasonable costs and attorneys' fees;

      c.      Award her punitive damages; and

      d.      Grant her any other relief this Court deems just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**MARK B. FROST & ASSOCIATES**

*/s/ Dylan T. Hastings*
Mark B. Frost, Esquire
Dylan T. Hastings, Esquire
One South Broad Street, Suite 1510
Philadelphia, PA 19107
P: (215) 351-3333
F: (215) 351-3332
mfrost@mfrostlaw.com
dhastings@mfrostlaw.com
*Attorneys for Plaintiffs*

Dated: October 20, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AL-AMIN ABDUL-JABBAR,** | : | **CIVIL ACTION** |
| **SHATISHA ABDUL-JABBAR,** | : | |
| **LATYSA BELL, and** | : | |
| **SHARON BELL,** | : | **No.  2:21-cv-2077** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA,** | : | |
| **OFFICER MATTHEW SIBONA,** | : | |
| **OFFICER NATHAN LONDON,** | : | |
| **OFFICER LEVAUN RUDISILL** | : | |
| **OFFICER DIETRA CUFFIE,** | : | |
| **OFFICER [FNU] SIMMONS,** | : | |
| **OFFICER [FNU] FLOYD,** | : | |
| **OFFICER [FNU] FRANCIS,** | : | |
| **OFFICERS JOHN AND JANE DOES 1-10** | : | |
| **In their individual and official capacities,** | : | |
| **ASSISTANT DISTRICT ATTORNEYS** | : | |
| **JOHN AND JANE DOES 1-10,** | : | |
| **In their individual and official capacities,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>CERTIFICATION OF SERVICE</u>

I, Dylan T. Hastings, Esquire, certify that on this date that I caused a true and correct copy

of the foregoing Amended Complaint to be served on all counsel of record via ECF.


**MARK B. FROST & ASSOCIATES**

*/s/ Dylan T. Hastings*
Dylan T. Hastings, Esquire
One South Broad Street, Suite 1510
Philadelphia, PA 19107
P: (215) 351-3333
F: (215) 351-3332
dhastings@mfrostlaw.com
*Attorneys for Plaintiffs*

Dated: October 20, 2021